IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.          CRIMINAL ACTION NO. 2:13-cr-00224

DESMOND RA'KEESH WHITE,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending are Defendant Desmond Ra'Keesh White's motion in limine [ECF 21] and motion to suppress [ECF 22].

On April 2, 2014, the Court held an evidentiary hearing on both motions. At that hearing, Defendant represented to the Court that the issues raised in his motion in limine were mooted by the government's response. (ECF 39 at 3.) The motion in limine [ECF 21] is therefore **DENIED AS MOOT**. After the hearing, the parties filed supplemental briefing for the motion to suppress. For the reasons that follow, the motion to suppress [ECF 22] is **DENIED**.

I.  BACKGROUND

Defendant is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Defendant moves to suppress statements he made during a July 9, 2013 traffic stop. Defendant also seeks to suppress all fruits of the subsequent search of the vehicle (including the firearm that forms the basis of the offense).

The following facts were adduced through evidence and testimony at the suppression hearing by Ericka Teunis, Corporal Justin Doughty, and Patrolman Anthony Gaylor. The facts are not seriously in dispute, except as to two key points indicated below.

On the afternoon of July 9, 2013, Corporal Justin Doughty of the Charleston Police Department pulled Ericka Teunis over while she was driving along West Washington Street in Charleston, West Virginia. According to Corporal Doughty, Teunis had just failed to stop at a stop sign. Soon thereafter Teunis had swerved partially off the road and into a parking lot as she passed by the officer's marked police cruiser, which was driving in the opposing lane of traffic. The Defendant and a male, identified to the Court only as "Bone", were also riding in Teunis' car, a two-door Kia coupe. After approaching the driver's side of the vehicle and speaking to Teunis through her open window, Corporal Doughty asked Teunis to step outside of the car.

At this point, Corporal Doughty's evidence conflicts with the testimony provided by Teunis. According to Corporal Doughty, he pulled over the vehicle to see if Teunis was intoxicated or having a medical issue. (ECF 39 at 35; *cf. also* ECF 43–1 at 6.) After approaching the vehicle and speaking to Teunis about her license and registration, the officer was satisfied from observing Teunis that she was not intoxicated and, thus, he made no attempt to administer a field sobriety test or a breathalyzer test or otherwise to inquire about Teunis' sobriety (ECF 39 at 35–37). However, while speaking with Teunis through the open driver's side window, but before concluding that Teunis was sober, Corporal Doughty smelled the odor of burned marijuana coming from the vehicle (ECF 39 at 12, 37, 56–58; *cf. also* ECF 43–1 at 6) and "felt like there could be illegal drugs inside the vehicle" (ECF 39 at 37). Corporal Doughty testified that he extended the traffic stop on the basis of this perceived marijuana smell. (ECF 39 at 56.) When he

asked Teunis to get out of the car, it was "due to two others being in the vehicle so I could ask her about that." (ECF 39 at 12; *cf. also* ECF 43–1 at 6.) Outside, Corporal Doughty "asked [Teunis] about the smell and she kept saying she does not smoke marijuana but didn't know about the two others." (ECF 43–1 at 6; *cf. also* ECF 39 at 13.) Thereafter, Teunis gave oral consent for Corporal Doughty to search her car. (ECF 39 at 13; ECF 43–1 at 6.)

Teunis, on the other hand, claimed that after Corporal Doughty asked her to step out of the car he questioned her about being drunk. (ECF 39 at 94.) "He said, as he looked down at the floor, wouldn't even look in my eyes, he said, 'Well, I think you're drunk.'"(*Id.*) Teunis admitted that Corporal Doughty did not conduct any sobriety tests on her (*Id.* at 94–95) and "[n]ever even brought it back up again" after the initial question about her sobriety (*Id.* at 101). In contrast to Corporal Doughty's testimony, however, Teunis said that Corporal Doughty asked her nothing about marijuana or drugs, that there was no marijuana smell in her car, and that she did not perceive any marijuana smell on any of the other occupants of her car. (*Id.* at 95.) Teunis stated that she did not remember giving Corporal Doughty oral consent to search her car, although she did not actually deny having given oral consent. (*Id.* at 96.)

The dashcam video shows that after speaking with Teunis outside of the car the officer returned to the car, opening the front passenger seat door, and motioned for Defendant to get out of the car. He then motioned to Teunis to return to the car, and she returned to her seat inside the car. Corporal Doughty testified that at about that point he "went and spoke to the front seat passenger and started asking him questions about the smell." (ECF 39 at 13.) According to the officer's incident report, Defendant "admitted that he smoked [marijuana] earlier." (ECF 43–1 at 6.) Corporal Doughty claimed that when he asked Defendant, now outside of the car, if there was

3

anything illegal inside the car, Defendant denied it. However, Corporal Doughty noted in his incident report that he did not believe Defendant due to his "looking around and the tremors in his voice." (ECF 43–1 at 6.) Corporal Doughty placed Defendant in the back seat of his police cruiser. Doughty returned to Teunis' car and opened the front passenger door so he could speak to "Bone", seated in the back passenger seat of the car.

    At this time, through the open front passenger door, Corporal Doughty observed a silver .357 Magnum revolver between the front passenger seat and a piece of plastic mounted to the seat. Corporal Doughty left the gun there and without saying anything else returned to the police cruiser and put Defendant in handcuffs. Corporal Doughty testified that he was satisfied that in the meantime backseat passenger "Bone" wouldn't have been able to get to the gun, and, in any event, that he was not concerned that "Bone" would reach for it as nothing was ever discussed about it. (ECF 39 at 41.) Returning to Teunis' car, Doughty drew his weapon and ordered Teunis and "Bone" both to put their hands in the air, radioed for backup, and put Teunis and "Bone" in handcuffs. He then retrieved the revolver from the front passenger seat. After other units arrived on the scene, Corporal Doughty read Defendant his *Miranda* rights. Defendant admitted that the gun was his and that he was currently on parole for a robbery charge. (ECF 43–1 at 6.) After Defendant was taken into police custody and again read his *Miranda* rights in the police station's interview room, Defendant again admitted to possessing a firearm, as well as to knowing that he was not allowed to possess a weapon. (*Id.*)

    Patrolman Anthony Gaylor conducted a canine sniff of the exterior of the car, and the vehicle was subsequently searched by Patrolman Gaylor and a Corporal Young. According to the officers, Corporal Young found a "small marijuana bud" (ECF 43–1 at 6), "smaller than the head

4

of an eraser on a pencil" (ECF 39 at 67), in a hard-to-reach spot in the floorboard area between the center console of the car and the passenger side seatbelt harness (ECF 39 at 84; ECF 43–1 at 6). Although the government's response to the motion to suppress described the marijuana bud as "burned" (ECF 26 at 8), Patrolman Gaylor's and Corporal Doughty's incident reports did not contain indications that the bud was burnt (ECF 38-37 at 1; ECF 43-1 at 6; *cf.* ECF 39 at 55), and neither officer testified that it was. Patrolman Gaylor admitted during testimony that the officers did not take any photographs of the marijuana bud or preserve it as evidence. Instead, it was destroyed at the scene. (ECF 38–37 at 1; *see also* ECF 39 at 67–68 ("Q. Why was it destroyed on the scene? A. Just being such a small piece of marijuana, there's really not enough there. Even if you field test it, then that -- the whole part of that is gone and it's just not an amount that you're going to recover to log in for evidence or anything like that.").)

Teunis, on the other hand, testified that after the police claimed they had found a bit of marijuana in her car, she said "'Can I see it,' you know, and they said, 'No. You don't have to worry about that. You're not going to get charged with it.'" (ECF 39 at 98.) Teunis testified that she did not see any marijuana being recovered from her car and that she did not see the officers react in any way that suggested they had found marijuana or any other drug. (*Id.* at 98–99.)

While on the scene, Teunis provided written consent for law enforcement to search her residence, which she shared with Defendant at that time. The officers later searched the residence and found a holster capable of holding the pistol found in the vehicle but not additional drugs.

## II. LEGAL STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const.

Amend. IV. The "[t]emporary detention of individuals during the stop of an automobile by police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). When inculpatory evidence is discovered as a result of a Fourth Amendment violation, it may be subject to suppression under the exclusionary rule. *United States v. Gaines*, 668 F.3d 170, 173 (4th Cir. 2012).

The mandate of the Fourth Amendment requires adherence to judicial processes, and exemptions to the general requirement that law enforcement officers obtain a warrant to effectuate a search or seizure lie only in certain well-delineated circumstances. *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *United States v. Dart*, 747 F.2d 263, 267 (4th Cir. 1984). The burden is on the government to show the need for the exemption. *Jeffers*, 342 U.S. at 51 (citing *McDonald v. United States*, 335 U.S. 451, 456 (1948)).

### III. DISCUSSION

In his motion to suppress, Defendant makes three separate challenges. First, he contends that Corporal Doughty's initial stop of Defendant's vehicle was unlawful and, thus, all evidence must be suppressed. (ECF 22 at 2.) Second, assuming the legality of the initial stop, Defendant contends that the traffic stop was unlawfully extended. (*Id.*) Finally, he contends that the taint of these violations was purged neither by Ms. Teunis' consent nor by the *Miranda* warnings given to Defendant subsequent to the extension of the stop. The Court will address each of Defendant's contentions in turn.

A. *Initial Stop*

The Court rejects Defendant's challenge to the legality of the initial stop. A police officer

may stop a vehicle on the basis of a "reasonable suspicion" that criminal activity is afoot. *United States v. Arvizu*, 534 U.S. 266, 273–75 (2002*). See also United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) ("Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop.").

Corporal Doughty testified that he observed Teunis' swerve off the road. His incident report indicates that Teunis did so after observing the officer's marked police cruiser. Doughty's testimony and report are corroborated by the police cruiser dashboard camera video that was introduced at the suppression hearing, which shows Teunis's car partially veering into the parking lot just before it passed by his car. (ECF 38–1 at 16:21:57–16:22:00.) W. Va. Code, § 17C-7-9 provides that "(a) Whenever any roadway has been divided into two or more clearly marked lanes for traffic the following rules . . . shall apply: (1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." Violation of this traffic regulation is defined as a misdemeanor. W. Va. Code, § 17C-7-9. Defendant argues that whether or not Teunis' swerve constituted an actual traffic violation is "debateable", as Teunis allegedly was justified in veering into the parking lot by a need to avoid potholes and did so safely (ECF 43 at 6–8). However, this is not a trial of whether Teunis did in fact commit a traffic violation. It suffices that it was reasonable for Corporal Dougthy to infer under the circumstances that she may have. Based on the totality of the circumstances, the officer had at least a reasonable suspicion on the basis of which to conduct a stop.

Corporal Doughty also testified that he wanted to see if the driver was intoxicated or

having a medical issue. W. Va. Code, § 17C-5-2(d) provides that any person who drives in West Virginia while under the influence of alcohol, a controlled substance, or drugs is guilty of a misdemeanor. Observing Teunis' vehicle partially veering into the parking lot and then back into the roadway is conduct that could have reasonably led Doughty to suspect that Teunis was driving under the influence. Accordingly, the record plainly shows reasonable suspicion for the initial stop.

Defense counsel strenuously cross-examined Corporal Doughty as to his motives in making the traffic stop.[1] Defendant also attempts to frame both of the proffered reasons as pretextual.[2] Where, as here, there is reasonable suspicion to make the traffic stop, the subjective motivations of the police officer are simply not relevant to the Fourth Amendment analysis. *See United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011) ("Any ulterior motive a police

---

[1] Corporal Doughty's incident report cited the reason for the stop as failure to maintain lane of travel and made no mention of a failure to stop at a stop sign. (ECF 43–1 at 6.) On direct examination, when asked if he recalled why he made the stop, Corporal Doughty testified that he stopped Teunis' car "when I observed that vehicle go through a stop sign that was clearly marked and the driver of the vehicle also veered off the road". (ECF 39 at 11). Then, on cross-examination Corporal Doughty's testimony suggested that his primary reason for the stop was the failure to maintain lane of travel. (ECF 39 at 27, 35). Defendant has made much of this apparent inconsistency, asserting that Corporal Doughty "eventually had to concede and admitted multiple times during cross examination that he did not rely upon anyone running a stop sign as an actual justification for stopping the Kia Forte" (ECF 43 at 5–6) (emphasis omitted). If it was the case that in preparation for the suppression hearing Corporal Doughty went over the footage of the traffic stop and identified a second traffic violation that he may have overlooked when making the stop, the Court would not look favorably on such a practice. However, it is also possible that the officer made an honest mistake between what he recalled about the events that transpired ten months before the hearing and the video, which may have been used to refresh his memory. Moreover, the exchanges on this issue between defense counsel and Corporal Doughty on cross-examination may also have been marred by unclear and imprecise communication. See ECF 39 at 18 ("Q. Okay. Corporal Doughty, the government put in its memorandum responding to my motion and you testified on direct that the silver Kia Forte ran a stop sign? A. Yes, sir. Q. That's not why you pulled them over, is it? A. Yes, it is."); *id.* at 27 ("Q. Okay, but your reason for stopping them, rather than the stop sign that's in these pictures, was because she swerved out of her lane of travel? A. Yes. Failure to maintain lane."); *id.* at 35 ("Q. You stopped this vehicle to see if the driver was intoxicated or having a medical issue, didn't you? A. Yes. Q. Not because she ran a stop sign? A. That was my reason for stopping, but yes. Q. Well your reason isn't expressed anywhere prior to the government filing a response to my motion. You would agree with that, right? A. Yes, but in my report, it clearly states that the vehicle ran off the road. Q. I was talking about the stop sign, but I'll take that.").

[2] See ECF 43 at 9 ("Given how he treated the occupants of the Kia Forte after the stop was initiated, it is fair to infer that without smelling anything - Doughty's subjective intention was to search as many vehicles as possible coming from or going into Orchard Manor for drugs and/or guns.").

officer may have for making the traffic stop is irrelevant.") (citing *Whren*, 517 U.S. at 813 (1996) and *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (noting that reasonableness under the Fourth Amendment is evaluated objectively)).

Accordingly, the Court finds that the initial stop was lawful because, at the time of the stop, Corporal Doughty possessed at least a reasonable suspicion to make the stop.

*B. Extension of the Stop*

Defendant's challenge to the lawfulness of the extension of the initial stop is also without merit. "If a police officer seeks to prolong a traffic stop to allow for investigation into a matter outside the scope of the initial stop, he must possess reasonable suspicion or receive the driver's consent." *Digiovanni* 650 F.3d at 507. *See also United States v. Brugal*, 209 F.3d 353, 357 (4th Cir. 2000) (stating that where the occupants of a vehicle are detained beyond the scope of a routine traffic stop, the officer must be able to articulate "reasonable suspicion that criminal activity is afoot"). In addition, if probable cause exists to believe a vehicle contains contraband or evidence of a crime, the "automobile" exception applies and a vehicle that is "readily mobile" can be searched without a warrant. *See, e.g., Maryland v. Dyson*, 527 U.S. 465, 466 (1999). It is clearly established law that when an officer conducting a traffic stop detects the aroma of marijuana emanating from the vehicle, the officer has probable cause to search the vehicle. *See, e.g., United States v. Lewis*, 606 F.3d 193, 197–98 (4th Cir. 2010).

The crux of Defendant's argument centers on the factual dispute over whether Corporal Doughty smelled the odor of burnt marijuana after pulling over Teunis' vehicle. Defendant asserts that the Court should not believe Corporal Doughty's claim that he smelled marijuana because the officer's testimony included material inconsistencies about his motives at the outset

9

for stopping Teunis' car. Defendant contends that Corporal Doughty has a credibility problem that corrupts his entire testimony. However, the Court is unconvinced that what Defendant labels inconsistencies in Corporal Doughty's testimony are in fact inconsistencies.[3]

Defendant also points out that Corporal Doughty never saw any of the vehicle occupants with marijuana and that the marijuana bud that was allegedly recovered was not alleged to have been burnt. The implicit assumption in this line of Defendant's reasoning is that there could not have been a burnt marijuana smell unless there was burnt marijuana in the car at the time the vehicle was pulled over. The Court rejects this reasoning because it is equally plausible that a smell of burnt marijuana lingered from prior consumption in the vehicle or that the odor attached to the clothing of one or more of the occupants of the vehicle from prior consumption outside of the vehicle. Defendant actually admitted to smoking marijuana earlier in the day, according to Doughty's incident report.[4]

The Court ultimately credits Corporal Doughty's testimony that he smelled burnt marijuana because it is bolstered by the evidence of his subsequent behavior and other extrinsic evidence consistent with that claim. The officer indicated that he asked Teunis to step out of her car to inquire about the source of the smell of marijuana without being within earshot of her passengers. It is reasonable that the officer felt Teunis might be more forthcoming about the source of the alleged marijuana smell if her passengers could not hear her, as it is also plausible that all three vehicle occupants were suspects at that moment. Teunis also admitted that Corporal Doughty did not administer a field sobriety test or otherwise test her sobriety after she stepped out of the car. According to Doughty, he continued investigating the source of the marijuana

---

[3] See *supra* note 1.
[4] The Court doubts, however, that Corporal Doughty smelled the marijuana bud that the other officers testified that they located between the seats and then destroyed.

smell by asking Defendant about it. Later, Corporal Doughty requested a dog sniff of the car. That Corporal Doughty smelled the aroma of burned marijuana is also corroborated by the subsequent alert by the drug canine that it detected the aroma of drugs; the results of the sniff, however, are not essential to the Court's finding.[5]

The probable cause established by the smell of marijuana permitted law enforcement to conduct a warrantless search of the vehicle. *See, e.g., Lewis*, 606 F.3d at 197–98. Defendant's motion to suppress evidence obtained during the search is therefore without merit.

### C. Oral Consent and Fruit of the Poisonous Tree

Because the Court finds that both the initial stop and the subsequent extension of the stop were appropriately justified, it is not necessary to determine whether Teunis gave valid oral consent.

As conceded by Defendant at the hearing, his argument for suppression of his statements to the police subsequent to the traffic stop was based upon the "fruit of the poisonous tree." As the Court has rejected Defendant's arguments regarding the initial stop and the extension of that stop, there is no poisonous tree and, therefore, no basis to suppress Defendant's statements.

---

5  To the extent that Defendant attempts to discredit the conduct of the dog sniff (ECF 43 at 24–27), the Court is not in a position to evaluate whether any breach of accepted dog sniff methods occurred in the absence of expert testimony. No clearly egregious behavior is before the Court. Defendant also argues that it strains credulity that Patrolman Gaylor and Corporal Young recovered a marijuana bud which they not only failed to preserve but also failed to document when a camera phone and a dashboard camera were both on hand. The officers had a minimally plausible reason for destroying the marijuana bud, see discussion *supra* Part I. On the other hand, destroying without documenting readily-documentable evidence that is foreseeably relevant to a future criminal hearing when officer and public safety were not at risk was not the most exemplary police work. It could cast some doubt on the credibility of the dog sniff. However, in light of the relative unimportance of the alleged existence of the marijuana bud to the determination of whether Corporal Doughty smelled burnt marijuana, this issue is a red herring. The result of the dog sniff is not as important as the fact that Doughty ordered a dog sniff.

11

*III. CONCLUSION*

In the annals of the history of police work, this traffic stop will never be held up as an ideal—for a number of reasons. However, the Court finds no basis to suppress the resulting evidence. Therefore, the Court **DENIES AS MOOT** Defendant's motion in limine [21] and **DENIES** Defendant's motion to suppress [ECF 22].

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

        ENTER:    September 15, 2014

_____

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE